In the Matter of the CITY OF NEW YORK, Relative to Acquiring Title to Real Property for the Widening of ALLEN STREET.

Supreme Court, New York County, January 4, 1933.

*Chambers & Chambers* [*Harry B. Chambers* of counsel], respondents, and as attorneys for Harris Goldman and David Suib, of counsel.

*Shaine & Weinrib* [*Edward C. Weinrib, Benjamin Seligman* and *Edward J. Mallin* of counsel], for Fannie Siegel, executrix, etc., petitioner.

*Bregman & Bregman* [*Hyman Bregman* of counsel], for Fannie Malzman, administratrix, petitioner.

*Arthur J. W. Hilly, Corporation Counsel* [*Joseph J. Dunn, Assistant Corporation Counsel*], for the City of New York.

JACOB MARKS, Official Referee. On August 12, 1902, by an instrument reciting " This indenture made this 12th day of August, in the year one thousand nine hundred and two between Edward Albert Ridley of Farnwood, N. J., party of the first part, hereinafter designated as the landlord, and Harris Goldman and Pincus Malzman of the City, County and State of New York, parties of the second part, hereinafter designated as the tenants," the landlord rented to the tenants premises at the corner of Allen and Grand streets for the term of twenty-one years from December 1, 1902, at a yearly rent payable in equal quarterly payments, with the privilege of a renewal for twenty-one years additional.

There is no declaration in this lease as to the interests of the lessees therein, whether joint or as tenants in common or as copart-

ners. Therefore, in the absence of a declaration in the instrument and standing alone, the estate granted would have to be held to be a tenancy in common. (Real Prop. Law, § 66.) Whether the leasehold be regarded as a chattel real or chattel personal, the provisions of this section would apply. (*Matter of Kimberly*, 150 N. Y. 90.)

Harris Goldman, the surviving tenant named in said lease, claims that this lease was a partnership asset; that the tenants were copartners engaged in the business of operating real estate for profit. The fact that the lease does not recite the interests of the tenants therein and does not recite that it was made or the term granted to them as partners, does not preclude Goldman from establishing by parol evidence the fact that though title to the real estate or to this lease was taken in the individual names of Goldman & Malzman, such property is partnership property, and, therefore, subject to the rights and obligations of the grantees or tenants as copartners. (*Fairchild* v. *Fairchild*, 64 N. Y. 471; *Buckley* v. *Doig*, 188 id. 238; *Greenwood* v. *Marvin*, 111 id. 423; *MacFarlane* v. *MacFarlane*, 82 Hun, 238.)

It has been established, and I find as a fact, that Harris Goldman and Pincus Malzman, the tenants named in the said lease above mentioned, were copartners in business at the time this lease was made to them, engaged under the firm name of Goldman & Malzman in the business of operating real estate and dividing the profits, and that this lease, as well as the rental or profits derived by subletting the premises described in said lease, were partnership property and assets. That while the lease on its face and without explanation indicates a tenancy in common, it was in fact taken by Goldman & Malzman as a partnership asset and venture and as and for their benefit as copartners in every advantage to be had therefrom.

The course of dealings of the parties as evidenced by documents bearing their signatures and reciting their firm name, establishes the fact of copartnership.

While it is provided by paragraph 3 of section 11 of the Partnership Law that the sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived, yet it has been established to my satisfaction that not only in the gross returns but in the leasehold itself and in other properties Goldman & Malzman were interested as copartners.

On June 20, 1904, the lessees rented the ground floor corner store and second and third lofts of the premises mentioned in the lease for the term of eighteen years, with a privilege of renewal for twenty-one years, to a tenant, and in this lease they described them-

selves as follows: " Harris Goldman and Pincus Malzman, composing the firm of Goldman & Malzman," and each of them signed the lease. There is thus the strongest kind of an admission by both parties that there was a partnership.

On February 25, 1919, a lease was made by the Bowery Bank to " Pincus Malzman and Harris Goldman, doing business under the name of Goldman & Malzman," of a room in the Bowery Bank Building " for the transaction of their business as real estate office and insurance," and this lease is signed " Goldman & Malzman, Pincus Malzman."

On April 8, 1913, Harris Goldman and Pincus Malzman rented out the top floor of 63 Orchard street and received a note payable to Goldman & Malzman as security for one month's rent. On April 22, 1912, they gave a lease of part of the premises, describing themselves as " Harris Goldman and Pincus Malzman, landlords." On March 27, 1916, they leased a part of the premises, again reciting themselves as " Harry Goldman and Pincus Malzman, landlords." On February 15, 1909, they leased part of the premises in the same way. On November 5, 1909, an agreement was made with Harris Goldman and Pincus Malzman extending the time of payment of a mortgage upon premises · owned by them in Sullivan county.

Goldman & Malzman assigned a one-third interest in this lease to Harris Siegel, who died on September 23, 1918. Fannie Siegel was named and qualified as the executrix of his estate.

Pincus Malzman died in December, 1919, and Fannie Malzman was appointed the administratrix of his estate on January 8, 1920.

After the assignment of a one-third interest in this lease to Siegel and during the lifetime of Malzman and Siegel, the net profits derived from the leasing of the said premises were distributed by monthly checks to Goldman, Siegel and Malzman and after the death of Malzman and Siegel to their estates.

Although there was no partnership capital used in acquiring the lease, the consideration to the owner was the rent payable out of the income derived from subletting the premises — the business conducted by the tenants. The rents were deposited in one bank account and after payment of the expenses the net profit was divided equally between Goldman, Malzman and Siegel.

Upon the death of Malzman, Goldman was the liquidating partner and became vested with the legal title to the lease and other property of the firm and possessed the sole right to liquidate the partnership assets. The right of a surviving partner to collect the firm assets and debts due to it implies the right to retain counsel therefor, and the act of Goldman in retaining counsel under the circumstances was an appropriate and necessary act for winding up the affairs and completing an unfinished transaction, as the term of the lease

and the partnership interest therein had not expired. The same rule applies to a joint adventure. (*Losch* v. *Marcin*, 251 N. Y. 402, 409; *Wilcox* v. *Pratt*, 125 id. 688; *Hardin* v. *Robinson*, 178 App. Div. 724 [1st Dept.]; affd., 223 N. Y. 651.)

Retaining counsel to represent the firm was not a new contract for the continuation of the business.

The business of the firm was that of operating and leasing real estate. This retainer was a contract for the services of attorneys to realize upon what was claimed by the owner of the fee to be a worthless asset of the firm but which, as a result of the services of Chambers & Chambers and David Suib, attorneys, was held to be a very valuable partnership asset.

The leasehold was threatened with extinction by reason of the landlord's claim that the firm of Goldman & Malzman, the tenants, had no interest therein that entitled them to compensation by the city, and retaining counsel to defeat that claim and to realize upon it as an asset of the copartnership was a necessary and legitimate act in connection with the winding up of the affairs of the partnership.

Mr. Goldman testified that, before retaining the firm of Chambers & Chambers to look after the interests of the firm in the condemnation by the city of the property covered by the lease, he spoke to Mrs. Siegel, who as executrix represented the one-third interest therein assigned to her husband, and told her it would be necessary to employ an attorney in the matter and she consented that he employ one upon a percentage basis; that she would depend upon Mr. Goldman to make an arrangement with an attorney upon such a basis. I find as a fact that Goldman was authorized to employ counsel, both as a surviving partner of the firm of Goldman & Malzman and also in behalf of the estate of Siegel, which had a one-third interest in the leasehold. Aleck Siegel, son of Mrs. Siegel, represented his mother in collecting her share of the rents, and Goldman also discussed with the son in March, 1930, the matter of the condemnation proceeding. Mrs. Siegel stated to Goldman that her son Aleck would attend to the matter and would take care of everything relating to the property, and the son told Mr. Goldman that his mother would not spend any money and that it would be necessary to secure the services of an attorney upon a percentage basis. Joshua Horowitz testified that he was present at a conversation at which Mrs. Siegel and her son expressed willingness to employ a lawyer upon a percentage basis. Jane Suib, a daughter of Goldman, also testified that she was present at a conversation when Mrs. Siegel inquired of her father whether he had obtained a lawyer to represent them in the condemnation proceeding, and he said he was trying to obtain a condemnation lawyer but would find it difficult

to get one who would handle the matter on a percentage basis, and that that was the only way a lawyer would be procured, and Mrs. Siegel said it would be agreeable to her and whatever was done she would stand by her share.

The testimony of Mrs. Siegel fairly construed corroborates the testimony of these witnesses that she knew of the contemplated employment of an attorney and gave her consent to such employment; that she knew of the condemnation proceedings; that she knew it was necessary to retain someone to look after her interests; that Mr. Goldman told her he proposed to employ someone to look after her interests in the property as well as that of the other partners. I discredit her testimony given on direct examination that she did not authorize the employment of an attorney. She called at Goldman's office frequently for her monthly check and a statement, knew that the city proposed to take the property, and with this knowledge denies that she had any conversation with Mr. Goldman about it. Her testimony in this respect is highly improbable.

Before Chambers & Chambers were retained, efforts were made by the liquidating partner, Mr. Goldman, to secure other attorneys upon a contingent basis, but none was found who would handle it, as there seemed to be an opinion that the tenants could not recover. This was because of a provision in the lease which seemed by its very language to preclude a recovery by the tenants: " ' And it is further understood and agreed that if the whole or any part of the premises hereby demised shall during said term be taken under condemnation proceedings as provided by statute or by municipal or state authorities for any public or other use or purpose, then and in such case, the landlord, his executors, administrators or assigns, shall at no time be liable for any damage to the parties of the second part.' "

It was contended that that precluded recovery by the lessees. Then there was another clause in the lease to the effect that it could not be sold or assigned without the consent of the landlord, and the landlord's attorneys claimed that that gave it no market value, because he could refuse his consent.

There were other issues of fact and law tried and presented, including the amount of damage. Upon the trial Judge COTILLO was inclined to agree with the landlord. His statements during the trial are significant: " The Court: I do not think, Mr. Bowers, that you should go any further. I want to hear Mr. Chambers on that. Although I do not want to prejudge your claim here, it seems to me that the lease which is the contract between the parties contains this clause, ' shall at no time be liable for any damages to the parties of the second part,' that is, if this property is taken for

a public or municipal improvement. I want to get your point, Mr. Chambers." And again: " The Court: ' If the whole or any part of the premises hereby demised shall, during the said term, be taken under condemnation proceedings as provided by statute, or by municipal or state or other authority for any public or other use or purpose, then in such case the landlord, his executors,' and so forth and so on, ' are not liable for any damage.' " And again: " The Court: This matter is important to both sides. This clause contains words that are very emphatic and clear to my mind."

It was only after considerable argument and research and briefing that the tenants' contentions were sustained both at Special Term and in the Appellate Division.

The owner claimed that the tenant was not entitled to any damage under the rule laid down by the Court of Appeals in *Matter of Mayor of New York* (168 N. Y. 254), where, it was claimed by the owner, language similar to that used in the lease of Goldman & Malzman prevented the tenant from recovering any damages for his leasehold interest, as the same would necessarily have to be deducted from the total award to the owners, and that the case of *Matter of City of New York* (124 App. Div. 465) also prevented recovery by the tenants. Upon appeal the owner of the property in question also argued that Goldman & Malzman offered no legal evidence of the unexpired term of the lease, and that although the lease could be assigned only with the consent of the landlord, the tenant's expert expressly stated that he valued the same upon the assumption that the tenant had the absolute right to sell the lease and that he disregarded the portion requiring the tenants to pay all assessments for local improvements. Several briefs were filed at Special Term and also at the Appellate Division. I have examined these and the record on appeal and the proceedings as disclosed by the exhibits in evidence, and it is my opinion that a contingent fee of twenty-five per cent of the recovery agreed upon between Goldman and his attorneys in a condemnation proceeding, involving not merely the presentation of proof of title by an owner of ownership of a lease and expert testimony as to value, but a trial of technical questions of law and an appeal to the Appellate Division, cannot be held to be unconscionable.

There is no reason for limiting the lien of Chambers & Chambers to twenty-five per cent of the interest only of Goldman. Goldman, representing the firm of Goldman & Malzman as surviving partner, retained Chambers & Chambers to act for the copartnership interest and acted also in behalf of Mrs. Siegel. Chambers & Chambers when retained had no knowledge that there was an outstanding interest in Siegel of one-third. No other attorney appeared in behalf of the Malzman or Siegel estates.

It was only after the attorneys had been successful in obtaining a substantial award and the Malzman and Siegel estates realized that they would have to pay a substantial sum out of their shares that they raised the question as to the attorney's lien and Mrs. Siegel attempted to repudiate Goldman's agency in her behalf. It is not infrequent for clients to show a willingness to accept the full benefits of attorneys' successful efforts who had been retained upon a contingent basis and attempt to repudiate a contingent agreement because the result of the litigation exceeded their expectations.

The Malzman and Siegel estates appeared for the first time in these proceedings on June 24, 1931, after the award had been made. The Malzman estate is bound by the retainer because made by Goldman as surviving partner and the Siegel estate is bound by it because Mrs. Siegel, the executrix, expressly authorized Mr. Goldman to employ attorneys upon a contingent basis to protect also the interest that the estate represented by her had in the leasehold. Chambers & Chambers thus represented the entire leasehold. No fraud or misrepresentation on the part of the attorneys retained by Mr. Goldman is charged by any one.

The retainer, dated November 20, 1930, retains both Chambers & Chambers and David Suib as attorneys in the matter and provides for the payment to them of twenty-five per cent of the amount of the recovery, or if the claim is settled and adjusted prior to a trial they were to receive ten per cent of the amount of settlement. Mr. Suib, the son-in-law of Goldman, negotiated the making of the agreement.

Mr. Suib, by letter dated November 21, 1930, wrote to Chambers & Chambers: " Pursuant to our conference on the 14th instant I hereby confirm our understanding that I am to co-operate with you as counsel in the above entitled matter and I am to receive one-third of your fee for my services in accordance with the retainer dated November 20, 1930, setting forth the amount of fee."

No claim is made by the liquidating partner appearing in this proceeding by Mr. Suib as attorney that any improper or undue advantage was taken of him when he retained Chambers & Chambers. Whether an agreement retaining an attorney upon a contingent basis is unconscionable because of the large amount reserved for the attorney depends upon the circumstances of each case. (*Morehouse* v. *Brooklyn Heights R. R. Co.*, 185 N. Y. 520.) Had the services of the attorneys in this case consisted only of proving title of the tenants as lessees under the lease and submitting proof of value, and there were no other questions to be litigated, it might be that twenty-five per cent of the recovery of the large award in

this case might be held to be excessive, as services of that kind would not have required any special skill.

The word "unconscionable" has frequently been applied to contracts made by lawyers for what were deemed exorbitant contingent fees. But by that nothing more has been meant than that the amount of the fee standing alone and unexplained may be sufficient to show that an unfair advantage was taken of the client, or in other words, that a legal fraud was perpetrated upon him. (*McCoy* v. *Gas Engine & Power Co.*, 135 App. Div. 771, 772; *Morehouse* v. *Brooklyn Heights R. R. Co.*, *supra*.)

But considering that the client who made the contract, acting for himself and as surviving partner and as the duly authorized agent of Mrs. Siegel who represented a one-third interest in the leasehold, makes no claim of fraud or undue advantage against the attorneys in procuring the retainer, and considering further the character of the claim of the tenants, the services required in prosecuting it successfully to judgment, the questions of law and fact involved, it cannot be said that the amount agreed to be paid is unreasonable or unconscionable.

Fraud or bad faith in Suib making this contract or in Goldman permitting Suib to make it, cannot be predicated on the fact that Suib is the son-in-law of Goldman, and it is no violation of law or the canons of ethics for an attorney — son-in-law or stranger — to a claimant or party to an action to make an arrangement for dividing fees with an attorney whom he may retain as counsel in behalf of his clients.

Subdivision 1 of section 274 of the Penal Law (derived from section 74 of the Code of Criminal Procedure) permits such a division of fees. And canon 34 of the Canons of Ethics (Report of N. Y. State Bar Assn. 1931, p. 734) also provides that a division of fees for legal services is proper with another lawyer, based upon a division of service or responsibility.

It appears by the briefs at Special Term and at the Appellate Division that Mr. Suib did co-operate with Chambers & Chambers, acting as one of the counsel for the claimants, the firm of Goldman & Malzman, as represented by the surviving partner.

By an order made by Hon. SALVATORE A. COTILLO, one of the justices of this court, dated March 2, 1932, and filed in the office of the county clerk on March 4, 1932, the award for damage to the tenants or owners of said lease was made as follows: "Harris Goldman, individually, Fannie Malzman as administratrix of Pincus Malzman, deceased, subject to assignment of a one-third interest to Fannie Siegel as executrix under the last will and testament of Harris Siegel, deceased, $60,000, interest $6,600."

I am of the opinion and so find that the firm of Chambers & Cham-

bers has a lien to the full extent of twenty-five per cent upon the award above mentioned, as compensation for services rendered as attorneys in the proceedings in which said award was made and confirmed, and whatever interest is due and payable by the city upon said award the said Chambers & Chambers are also entitled to twenty-five per cent of said interest.